1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9           FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   JOSE AGUIRRE, JR,                    No C 06-4030 VRW

12              Plaintiff,
                                               ORDER
13         v

14   MICHAEL J ASTRUE, Commissioner of
     Social Security,
15
                Defendant.
16
     _____/
17

18

19         Plaintiff Jose M Aguirre, Jr appeals from the

20   decision of the Social Security Administration (SSA) denying him

21   social security disability benefits.  The court now considers

22   cross-motions for summary judgment.  Doc #9-1; Doc #10.  Because

23   the court concludes that the Administrative Law Judge (ALJ)

24   committed no legal error and his decision was supported by

25   substantial evidence, the court DENIES plaintiff's motion for

26   summary judgment and GRANTS defendant Michael J Astrue's motion for

27   summary judgment.

28   \\

I

A

Plaintiff was fifty-nine years old on April 16, 2003, the date he alleges be became disabled.  Administrative Record (AR), Doc #6 at 70.  Plaintiff is a college graduate.  AR 99.  Plaintiff has past relevant work experience as a loss prevention agent and as an accounting clerk.  AR 94.  Plaintiff reported that as a loss prevention agent he used his technical skill and knowledge, counted coins in counting machines, traveled to various locations to check company employees and lifted weights as heavy as fifty pounds occasionally and twenty-five pounds frequently.  Id.  As an accounting clerk, plaintiff did payroll, light bookkeeping and basic clerical work.  AR 564.  Plaintiff has not worked since April 16, 2003.  AR 70.

The administrative record contains many documents pertaining to plaintiff's respiratory-system concerns.  In 1998, plaintiff began consulting Dr Toby Levenson, MD, a board certified allergy and immunology specialist.  She noted that plaintiff then had a long history of asthma and that his symptoms included "wheezing, dyspnea on exertion, and cough."  AR 175.  Dr Levenson also reported that plaintiff had "a history of snoring, but no history of apneic episodes or daytime somnolence."  Id.  Dr Levenson's letter mentioned normal sinuses and recommended medication for plaintiff's asthma.  AR 176.

On April 19, 1999 Dr Levenson noted that plaintiff's cough had completely resolved.  AR 169.  She also wrote that plaintiff's wife reported to her that plaintiff had had nighttime apneic episodes for two years, during which interval he had gained

about fifty pounds.  Id.  Dr Levenson also wrote that "he does have daytime somnolence and snores at night."  Id.  Dr Levenson recommended that plaintiff obtain a sleep study to rule out sleep apnea.  Id.

On July 19, 1999, Dr Levenson reported that plaintiff's full pulmonary function tests revealed only mild obstructive ventillary defect and that plaintiff was "doing well clinically."  AR 165.  Dr Levenson stated that plaintiff was "awaiting a sleep study to rule out sleep apnea as a contributing medical problem."  Id.  On September 15, 1999 stated that plaintiff was "doing well," had "lost 13 lbs," was "sleeping well" and showed no symptoms of asthma or snoring.  AR 164.

One year later, plaintiff visited Dr Levenson again.  AR 163.  Dr Levenson's clinical notes from September 25, 2000 include a cryptic notation indicating symptoms of sleep apnea.  Id.  Dr Levenson's notes from a visit the following month, however, do not mention sleep apnea or a sleep study.  AR 162.  Rather, they indicated that plaintiff was "doing well," that his asthma was "under control" and that he had a "rare cough."  Id.

Plaintiff visited Dr Levenson again in the spring of 2001.  Her clinical notes from March 12, 2001 and April 30, 2001, do not mention sleep apnea or a sleep study.  AR 161, 160.

On June 04, 2001, Dr Levenson noted that plaintiff was "doing well" and was experiencing no problems.  AR 159.  On December 10, 2001, Dr Levenson recorded that plaintiff's asthma had subsided and that plaintiff was "feeling well."  AR 157.

In addition to his respiratory-system ailments, plaintiff has a history of orthopedic problems.  On November 16, 2000,

United States District Court

For the Northern District of California

plaintiff underwent arthroscopic knee surgery.  AR 381.  The procedure demonstrated significant arthritis in the left knee cap and evidence of significant arthritis in the medial compartment of the left knee.  AR 258.  After the arthroscopy, plaintiff required steroid injection and pain medication.  Id.

On May 16, 2001, orthopaedic surgeon Dr Daniel Morgan, MD noted that plaintiff had significant degenerative arthritis in the knee, with exposed bone.  AR 373.

The following year, on July 17, 2002, Dr Morgan stated that plaintiff was experiencing "increasing pain and discomfort in the medial aspect of the knee."  AR 260.  Dr Morgan obtained x-rays to evaluate the status of plaintiff's knee.  Id.  The x-rays confirmed that plaintiff had "bone against bone in the medial compartment of the left knee."  Id.  Plaintiff's right knee had slight narrowing of the medial compartment, not as "severe as that on the left."  Id.  Dr Morgan administered a steroid injection in the knee.  Id.  It was plaintiff's first injection in more than two years.  Id.

Plaintiff visited Dr Morgan again on October 8, 2002. Id.  In his notes, Dr Morgan stated that plaintiff was "actually doing well" and that the injection in his knee had helped.  Id.  Dr Morgan stated that plaintiff did not have significant pain in his knee; however, he did note that plaintiff had some trouble with his shoulder.  Id.  Dr Morgan administered a steroid injection to plaintiff's shoulder, and noted that plaintiff had "improvement in his symptoms."  AR 261.

Dr Morgan's February 18, 2003 notes stated that plaintiff had "developed pain and discomfort in the shoulder and also in the

4

United States District Court

For the Northern District of California

biceps region." AR 261. Dr Morgan determined that plaintiff had "gotten gradually more severe," so that he had "difficulty lifting his arm up with his elbow flexed and his arm somewhat forward." Id. Dr Morgan injected him with steroids and stated that plaintiff "had a definite improvement in his symptoms." Id.

Plaintiff also consulted cardiologist Dr Rohit Sehgal for heart problems. A March 7, 2003 echocardiogram performed by Dr Sehgal suggested mild diffuse cardiomypathy (inflamed heart muscle) and mild thickening of the left ventricle of the heart. AR 202. On April 25, 2003, Dr Sehgal performed a left and right catherization, coronary angiography and ventriculography. AR 191. Plaintiff engaged in exercise and cardio rehabilitation in 2003 and 2004. See, e g, 512, 515. A January 28, 2004 echocardiography demonstrated mild to moderate dilated cardiomyopathy. AR 526.

In May 2003, plaintiff at last underwent a sleep study with neurologist Dr Stephen Brooks, MD of the Stanford Sleep Disorder Group. AR 145. Dr Brooks's May 13, 2003 Nocturnal Polysomnogram (PSG) Report recorded minimal oxygen saturation levels of 84.8%, consistent with obstructive sleep apnea (OSA). AR 145-46. The oxygen saturation levels improved to 94.1% with continuous positive airway pressure (CPAP). Dr Brooks diagnosed OSA, noted that plaintiff improved with CPAP therapy and prescribed a CPAP device. AR 146. "Nasal CPAP is the treatment of choice for most patients with subjective sleepiness * * *. CPAP improves upper airway patency by application of positive pressure to the collapsible upper airway." The Merck Manuals Online Medical Library, "Obstructive Sleep Apnea Syndrome," <http://www.merck.com/ mmpe/sec05/ch061/ch061b.html> (visited August 16, 2007). On

United States District Court
For the Northern District of California

September 22, 2003, four months after the CPAP device was prescribed, Dr Levenson noted that plaintiff slept comfortably with CPAP therapy.  AR 401.

Meanwhile, a July 31, 2003 magnetic resonance image (MRI) of plaintiff's right shoulder, requested by treating physician Dr Khalid Baig, revealed continued shoulder problems.  Dr Morgan stated that this MRI demonstrated chronic rotator cuff tear and acromioclavicular arthritis.  AR 256.  Plaintiff informed Dr Morgan that cardio rehabilitation "exercises helped his shoulder" so that he did not feel a need to have any specific aggressive treatment directed to the shoulder.  AR 371.

On July 8, 2004, Dr Morgan noted that plaintiff's knees caused discomfort when he walked long distances and that plaintiff used a cane in his right hand and a knee brace for support.  AR 369. On October 20, 2004, Dr Morgan reviewed x-rays taken of plaintiff's left knee.  AR 367.  Dr Morgan recommended that the plaintiff be evaluated for total knee replacement.  Id.  On December 27, 2004, plaintiff underwent a minimally invasive mini-incision total knee arthroplasty for his osteoarthritis.  AR 293. On February 14, 2005 Dr Morgan noted that plaintiff complained of increased shoulder pain since using a cane following his total knee replacement, AR 358, but plaintiff testified soon afterward that the knee surgery had improved his knee condition.  AR 567.


B

On April 13, 2003, plaintiff filed an application for Social Security Disability Insurance Benefits.  AR 70-72.  In the disability report submitted in support of his initial application,

**United States District Court**

For the Northern District of California

plaintiff stated that he was disabled due to his cardiomyopathy, asthma, knee problems, seizures, sleep apnea and shoulder pain. AR 93. Both initially and on reconsideration, the SSA denied plaintiff's request for benefits, finding plaintiff not disabled within the meaning of the Social Security Act (Act). AR 27, 33.

On September 3, 2003, Dr B Camille Williams, MD, a non-examining State agency physician, opined that plaintiff could lift up to twenty pounds, stand and walk for at least two hours, sit for six hours and push and pull without limitations. AR 239. According to Dr Williams, plaintiff could occasionally climb, kneel, crouch and crawl. AR 240. Plaintiff was limited to "no constant" overhead reaching with his right arm. AR 241.

On January 26, 2004, Dr Morgan wrote a letter to the Department of Social Services in response to a request for information regarding plaintiff's medical condition. AR 254. Dr Morgan opined that plaintiff was basically unable to use the right upper extremity for any work-related duties at shoulder level or above and could not lift an object weighing more than four to five pounds to the shoulder level or above. AR 254. Dr Morgan noted that the plaintiff's left knee condition limited his ability to work in any kind of position requiring squatting, stooping, kneeling or any heavy lifting over ten to fifteen pounds. Id. Dr Morgan opined that although the right shoulder and left knee might require future surgical treatment, it was unlikely that plaintiff would return to gainful employment requiring him to be "involved in stooping, squatting, kneeling or nay heavy lifting over ten pounds" with or without surgical treatment. Id.

\\

7

**United States District Court**
For the Northern District of California

On March 30, 2004, Dr Harmon Michelson, MD, a non-examining agency physician, completed a residual functional capacity (RFC) assessment concluding that plaintiff could lift up to fifty pounds, stand and walk for two hours, sit six hours and push or pull with limitations in the upper extremities with postural, manipulative and environmental limitations.  AR 264-71.

On April 28, 2004, plaintiff filed a timely request for an administrative hearing.  AR 38.  On January 29, 2005 the ALJ sent plaintiff's attorney a pre-hearing letter requesting that plaintiff submit in advance all evidence on which plaintiff would rely.  AR 47.  The letter also requested a preliminary statement of plaintiff's theory, including plaintiff's position as to which step of the sequential evaluation set forth at 20 CFR 404.1520 (see infra), should be used to decide the case.  Id.

Plaintiff submitted a pre-hearing brief.  AR 134.  In the brief, plaintiff asserted that "the combined effect of the claimant's exertional and non-exertional impairments have met or equaled Paragraphs 1.02 (A) and 1.03 of the Listing of Impairments."  AR 138.  In the alternative, plaintiff argued that the combined effects of plaintiff's impairments precluded plaintiff from "performing his past relevant work, as well as any alternative work."  Id.  Plaintiff also argued that "using the Medical-Vocational Guidelines (GRIDS) in their framework as a basis for decisionmaking, Rule 201.06 mandates a finding of 'disabled.'"  Id.  Plaintiff did not make the argument he now makes on appeal –– that the severity of his OSA equals Listing 3.09 because the findings of the PSG test were of equal medical significance to the criteria set forth in the listing.

The administrative hearing took place on April 14, 2005. AR 49. At the hearing before the ALJ, plaintiff testified he was unable to work due to his knee pain, shortness of breath, cardiomyopathy, sleep apnea and asthma. AR 565. When asked how long he could stand without a break, plaintiff answered: "I'd say about 10 minutes or so." AR 567. Plaintiff testified that his medication caused headaches two or three times per week, and that it took him "anywhere from 20 to an hour" to sleep off his headaches. AR 573. Plaintiff also testified that he did not use his CPAP machine stating: "when I use it [...] I wake up all of a sudden with my throat very dry, and I tend to gag. I can't swallow right away or I can't breath." AR 572.

At the hearing, the ALJ described the plaintiff's residual functional capacity (RFC) to the vocational expert (VE) as:

> sedentary work, no work at heights, otherwise all postural activities, that is crouch, crawl, kneel, stoop, balance, and use of ramps and stairs, is at occasional, avoid concentrated exposure to fumes, dust, gases, and pollens, avoid all hazards as in hazardous machinery.

> with the dominant right upper extremity, over head reaching is limited to occasional, and no forceful pushing or pulling [and] as regard to sitting, standing, and walking, an allowance for a one minute stretch break at least every 30 minutes, standing to stretch to briefly stand and walk, and I define briefly standing and walking is up to a minute.

AR 582. The VE opined that a hypothetical individual of plaintiff's age, education and work experience and RFC, as set out by the ALJ, could not work as a loss prevention agent (plaintiff's prior employment), but could work as an accounting clerk if he took one-minute stretch breaks every thirty minutes. AR 582-83. The VE

United States District Court

For the Northern District of California

further opined that if plaintiff could not perform the job of accounting clerk, his skills would not be readily transferable to other occupations with the same or lesser degree of skill as his past relevant employment.  AR 583-85.  In addition, plaintiff would not be able to be employed if he had to alternate sitting and standing every ten minutes and took two to three thirty-minutes naps per day.  AR 586-87.

On August 17, 2005, the ALJ denied benefits based on the evidence presented at the hearing, including the testimony of plaintiff and the VE, the reports of Drs Baig and Morgan and other medical records.  AR 16-23.  The ALJ's decision set forth the five-step sequential evaluation of disability required by 20 CFR § 404.1520, that is:  (1) whether plaintiff was currently engaged in substantial gainful activity; (2) whether plaintiff had a severe impairment or combination of impairments; (3) if plaintiff had a severe impairment, whether plaintiff had a condition that met or equaled any condition detailed in the Listing of Impairments, 20 CFR Part 404, Subpart P, App 1; (4) if plaintiff did not have such a condition, whether plaintiff was capable of performing his past work; and (5) if not, whether plaintiff had the RFC to do other available work.

Applying this five-step sequential evaluation to plaintiff, the ALJ found that plaintiff had medically determinable impairments that significantly limited his ability to perform basic work activities, including:  cardiomyopathy, osteoarthritis of the left knee post total knee replacement, asthma, sleep apnea, obesity and a chronic right shoulder rotator cuff problem; but that he did not have an impairment that met or equaled any listed impairment.

10

United States District Court

For the Northern District of California

AR 22.  He found that plaintiff had the RFC to perform sedentary work with one-minute stretch breaks and other limitations as noted at the hearing.  Id.  At step four, the ALJ found that plaintiff's impairments did not —— and never had —— precluded the performance of his past relevant work as an accounting clerk.  Based on this finding, the ALJ concluded that plaintiff was not disabled at step four and therefore did not proceed to step five.  AR 23.  He also found plaintiff's subjective statements regarding pain and other symptoms non-credible.  Id.

The ALJ also noted that plaintiff's own statements to his treating physicians indicated that his symptoms had improved and/or stabilized with treatment.  AR 21.  In his decision, the ALJ noted that plaintiff reported in July 2003 that he could "walk for 2 miles, could drive for an hour, and could do shopping and yard work —— activities which are consistent with my residual functioning capacity finding."  AR 21-22.  The ALJ concluded, "taking into consideration all of the evidence of record, including the claimant's allegations of pain and other symptoms, that there has been no continuous 12 month period during which claimant has been unable to perform sedentary work with one minute stretch breaks every 30 minutes, and with the other limitations specified []."  AR 22.

In reaching this conclusion, the ALJ also discounted the opinions of treating physicians Dr Baig and Dr Morgan.  AR 21.  The ALJ concluded that Dr Baig's assessment appeared "to be based largely on claimant's subjective reports of functioning" and that "the medical evidence as a whole did not support the restricted functioning opined by Dr Baig."  Id.

11

United States District Court

For the Northern District of California

While rejecting Dr Morgan's opinion —— that plaintiff could not use his upper extremities to work at or above shoulder level, that he could not lift more than five pounds above shoulder level and could not engage in repetitive stooping, squatting or kneeling —— the ALJ pointed out that neither Dr Morgan's records nor plaintiff's records generally established that plaintiff was "limited for any continuous 12 month period since his alleged disability onset date."  AR 20.  The ALJ specifically pointed to Dr Morgan's notes documenting plaintiff's ability to "walk with no assistive device within 3 months" of his knee replacement.  AR 20-21.  The ALJ also pointed to records demonstrating significant relief of plaintiff's shoulder symptoms as a result of steroid injections.  AR 21.

Plaintiff appealed the ALJ's decision to the SSA's Appeals Council, which denied review.  On April 29, 2006, plaintiff timely filed the instant action for judicial review of the ALJ's decision.

II

The court's jurisdiction is limited to reviewing the administrative record to determine whether the ALJ's decision is supported by substantial evidence and whether the SSA complied with the requirements of the Constitution, the Act and its administrative regulations in reaching the decision reviewed.  42  USC § 405(g).  "Substantial evidence" is defined as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews v Shalala, 53 F3d 1035 at 1039 (9th Cir 1995).

\\

The Act provides that certain individuals who are "under a disability" shall receive disability benefits.  42 USC § 423(a)(1)(D).  Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 USC § 423(d)(1)(A).  An individual will be found disabled if his impairments are such "that he is not only unable to do his previous work but cannot, considering his age, education, and work experience engage in any other kind of substantial gainful work which exists in the national economy * * *."  42 USC § 423(d)(2)(A).

### III

Plaintiff makes four major contentions in support of his motion.  First, he contends that the ALJ's determination that plaintiff's OSA (Obstructive Sleep Apnea) did not meet or equal the criteria set for in the Listing of Impairments contradicted the clinical studies conducted to determine the presence and degree of the OSA.  Doc #9 at 17. Second, plaintiff contends that the ALJ improperly rejected the opinion of plaintiff's treating physician. Dr Baig.  Id at 18.  Third, plaintiff contends that the ALJ erred by discounting plaintiff's credibility without providing clear and convincing reasons for doing so.  Id at 21.  Finally, plaintiff contends that the ALJ erred by relying on the VE's answers to incomplete and inaccurate hypothetical questions.  The court disagrees with each of these contentions.

\\

13

**United States District Court**

For the Northern District of California

A

Plaintiff alleges presumptive disability under Listing 3.10.  Listing 3.10 in its entirety states "<u>Sleep related breathing disorders</u>.  Evaluate under 3.09 (chronic cor pulmonae) or 12.02 (organic mental disorders)."  Listing 3.09, not much more detailed, is as follows:

> <u>Cor pulmonale secondary to chronic pulmonary vascular hypertension</u>.  Clinical evidence of cor pulmonale (documented according to 3.00G) with:
>
> A. Mean pulmonary artery pressure greater than 40 mm Hg;
>
> Or
>
> B. Arterial hypoxemia.  Evaluate under the criteria in 3.02C2;
>
> Or
>
> C. Evaluate under the applicable criteria in 4.02.

4.02 concerns chronic heart failure.  An impairment is medically equivalent to a listed impairment if it is at least equal in severity and duration to the criteria of any listed impairment.  20 CFR § 404.1526.  Plaintiff argues that the severity of his OSA equals the listing because the findings from his May 2003 Nocturnal Polysomnogram (PSG) test are at least of equal medical significance to the required criteria contained in Listing 3.09.  Doc #11 at 5.

In determining whether a claimant equals a listing under Step 3, the ALJ must adequately explain his evaluation of alternative tests and the combined effects of the impairments.  <u>Marcia v Sullivan</u>, 900 F2d 172, 176 (9th Cir 1990).

The ALJ need not state why a claimant failed to satisfy every different section of the listing of impairments.  <u>Gonzalez v</u>

14

1 <u>Sullivan</u>, 914 F2d 1197, 1201 (9th Cir 1990). An examiner's findings

2 should be as comprehensive and analytical as feasible and, where

3 appropriate, should include a statement of subordinate factual

4 foundations on which the ultimate factual conclusions are based, so

5 that a reviewing court may know the basis for the decision. Id.

6 Plaintiff argues that the ALJ's determination improperly

7 fails to give controlling weight to the results of the PSG test from

8 the Stanford Sleep Disorders Group. Doc # 9-1 at 17. During the

9 PSG test, "while breathing unassisted, plaintiff's minimal oxygen

10 saturation was 84.8%," a result consistent with severe OSA. AR

11 479. Plaintiff asserts in his brief that oxygen saturation levels

12 below 90% are considered harmful. Doc #9 at 17. According to the

13 sleep study, with CPAP treatment Plaintiff's oxygen saturation level

14 improved to 94.1%. Id. Plaintiff testified, however, that when he

15 actually started using the CPAP device at home, he had to stop

16 because of dryness in his throat. AR 572. Plaintiff argues that

17 the severity of his OSA equals the Listing because the PSG findings

18 are at least of equal medical significant to the required criteria

19 contained in Listing 3.09/3.10.

20 While the ALJ is required to provide foundations for his

21 equivalency determinations, the ALJ is not required to come up with

22 every potential equivalency scenario on his own. The onus is on the

23 claimant to present a theory of equivalency to the ALJ. In this

24 case, the ALJ requested and received a pre-hearing brief setting

25 forth plaintiff's theory under which he believed he was entitled to

26 benefits. AR 134. Neither in the brief nor at the hearing did

27 plaintiff argue that plaintiff's PSG test results should establish

28 equivalency with Listing 3.10. The ALJ relied on

**United States District Court**
For the Northern District of California

1  the fact that plaintiff did not undergo the tests required in Parts

2  A and B of Listing 3.09.  AR 20.  Having failed to offer the PSG

3  test as medically equivalent, plaintiff cannot successfully contend

4  that the ALJ's decision was not supported by substantial evidence.

5       Furthermore, even if plaintiff had asked the ALJ to

6  consider the PSG test results in analyzing equivalency, plaintiff's

7  failure to comply with prescribed treatment might well have vitiated

8  the argument.  As previously noted, medical evidence in the record

9  establishes that plaintiff's condition improved with the prescribed

10 CPAP treatment.  The social security regulations require that

11 claimants follow prescribed treatment.  20 CFR 404.1530.  The

12 regulation states in relevant part:

13          (a) <u>What treatment you must follow</u>.  In order
14          to get benefits, you must follow treatment
            prescribed by your physician if this treatment
15          can restore your ability to work.

16          (b) <u>When do you not follow prescribed
            treatment</u>.  If you do not follow the
17          prescribed treatment without a good reason, we
            will not find you disabled * * *.

18 20 CFR 404.1530.  As a result of the Stanford study, Dr Brooks

19 prescribed plaintiff CPAP therapy going forward.  AR 146.  The PSG

20 test with the CPAP therapy showed plaintiff's oxygen saturation to

21 be at safe levels.  Although plaintiff's complaints of discomfort

22 resulting from the CPAP therapy may be valid, plaintiff has not

23 established that his physician instructed him to discontinue the

24 therapy or that he even discussed the problem with any doctor.

25 Rather, plaintiff glosses over his failure to follow prescribed

26 treatment.  Cf 20 CFR § 404.1530(c).

27 \\

28 \\

16

United States District Court
For the Northern District of California

**B**

The ALJ properly rejected the opinion of treating physician Dr Baig that plaintiff was unable to perform even sedentary work.  AR 556-57.  As a general rule, ALJs give the opinions of treating physicians more weight than the opinions of non-treating doctors.  Lester v Chater, 81 F3d 821, 830 (9th Cir 1996).  Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing specific and legitimate reasons supported by substantial evidence in the record for so doing.  Id.

The ALJ accorded Dr Baig's opinion less than controlling weight based on conflicting medical and other evidence in the record.  AR 21.  The ALJ noted that while Dr Baig attributed plaintiff's fatigue and poor concentration to cardiomyopathy, echocardiograms showed improvement since 2003.  He also explained that:  "while Dr Baig suggested in June 2005 that claimant would be unable to perform even sedentary work on a sustained basis due to fatigue and poor concentration, he acknowledged that the claimant's energy level has improved substantially since he last worked."  Id. The ALJ concluded that "the medical evidence as a whole does not support the restricted functioning opined by Dr Baig over a sufficient period of time."  AR 21.

The court notes, moreover, that in his June 2005 declaration Dr Baig seemed not to know that plaintiff had already stopped using the successful CPAP therapy, as plaintiff testified two months earlier in April 2005.  For example, Dr Baig stated "an eight-hour work day * * * would be very difficult for him because his sleep apnea, although helped by the CPAP machine, cannot

17

United States District Court

For the Northern District of California

completely take it away [sic], so he continues to have symptoms of sleep apnea."  AR 554.  This discrepancy suggests that Dr Baig based his opinion on incomplete information regarding plaintiff's treatment and condition.

The ALJ also explained that Dr Baig's assessments appeared to be based on plaintiff's non-credible, subjective reports of functioning.  AR 21.  See Part III.C, <u>infra</u>.

In rejecting the opinion of Dr Morgan (plaintiff's treating orthopedic surgeon) that plaintiff could not use his upper extremities to work at or above shoulder level, that he could not lift more than five pounds above shoulder level and that he could do no repetitive stooping, squatting or kneeling, the ALJ pointed to Dr Morgan's own treatment records.  AR 21.  Dr Morgan's notes documenting plaintiff's ability to "walk with no assistive device within 3 months" of his knee replacement support the ALJ's decision.  AR 20-21.  The ALJ also pointed to records demonstrating significant relief of plaintiff's shoulder symptoms as a result of periodic steroid injections.  AR 21.  The ALJ stated that "Dr Morgan's treatment records indicate that the claimant's shoulder symptoms were recurrent but not persistent."  Id.  Thus, the ALJ rejected Dr Morgan's "opinion as not well-supported by medically acceptable clinical and laboratory diagnostic techniques, if, in fact, he intended to find the claimant so limited for a period of at least 12 months."  Id.

The ALJ committed no error because he provided specific and legitimate reasons, supported by substantial evidence in the record, for rejecting the opinions of treating physicians Dr Baig and Dr Morgan.

United States District Court

For the Northern District of California

C

Substantial evidence also supports the ALJ's determination that plaintiff's subjective statements regarding disabling symptoms were not fully credible. Once a disability claimant establishes an underlying medical impairment reasonably expected to produce some subjective symptoms, the ALJ may consider various factors in assessing credibility of the allegedly disabling subjective symptoms. 20 CFR § 404.1529. Such factors include, <u>inter alia</u>, type, dosage, effectiveness and adverse side-effects of any medication; treatment, other than medication; functional restrictions; daily activities; and ordinary techniques of credibility evaluation. 20 CFR § 404.1529. If the ALJ's credibility finding is supported by substantial evidence, the courts may not engage in second-guessing. <u>Thomas v Barnhart</u>, 278 F3d 947, 959 (9th Cir 2002).

Here, the ALJ noted that plaintiff's own statements to his treating physicians indicated improvement and/or stabilization of his symptoms. AR 21-22. The record documents such improvement. See AR 186, 340, 395, 401. The ALJ reasoned that plaintiff's statements to his doctors contradicted his own claim of impairments so extreme as to prevent him from doing even sedentary work. AR 22.

The ALJ also cited plaintiff's July 2003 Daily Activities Questionnaire as support for his credibility determination. AR 22. There, plaintiff stated that he could walk for two miles, could drive for an hour, and could do shopping and yard work. AR 108-111. Plaintiff now argues that the statements were merely aspirational and did not accurately reflect his abilities. Doc #11 at 9. Yet, the record supports the ALJ's conclusion.

19

**United States District Court**
For the Northern District of California

1    Considering factors including treatment, functional
2 restrictions, plaintiff's daily activities and inconsistencies in
3 plaintiff's statements, the ALJ properly provided specific, clear
4 and convincing reasons to reject plaintiff's allegations of
5 subjective disabling symptoms.  The ALJ's credibility determination
6 must be upheld.

7

8                                  D

9    The VE's opinions are based on hypothetical assumptions
10 supported in the record and are therefore valid.  Having properly
11 rejected the opinions of Drs Baig and Morgan, the ALJ did not err by
12 excluding from the hypothetical question to the VE the functional
13 limitations contained in those opinions.  As discussed above, the
14 ALJ properly rejected the opinions of plaintiff's treating
15 physicians.

16    Plaintiff argues that no examining or consulting physician
17 opined that plaintiff could perform overhead reaching on an
18 "occasional" basis, as the ALJ represented to the VE.  The record
19 contains the opinion of non-examining state agency physician Dr
20 Williams, MD.  AR 241.  Dr Williams stated that based on the review
21 of the medical evidence, plaintiff was limited to "no constant"
22 overhead reaching with his right arm.  Id.  Dr Williams's opinion
23 therefore supports the assessment of plaintiff's functional
24 limitations presented to the VE.

25    The ALJ's hypothetical question did not incorporate the
26 opinion of Dr Michelson; however, Dr Michelson's opinion
27 contradicted that of Dr Williams.  Resolution of such evidentiary
28 conflicts resides with the ALJ as fact-finder.  <u>Sanchez v Secretary</u>

                                  20

of Health and Human Services, 812 F2d 509, 511 (9th Cir 1987).
Having properly rejected the opinions of Drs Baig, Morgan and
Michelson, the ALJ did not err in constructing the hypothetical
question consistent with the opinion of Dr Williams.  Thus, the
testimony of the VE constituted substantial evidence supporting the
ALJ's decision.


                                  IV

          For the reasons stated herein, the court affirms the ALJ's
decision to deny benefits.  Accordingly, the court DENIES
plaintiff's motion for summary judgment and GRANTS defendant Michael
J Astrue's motion for summary judgment.

          The clerk is directed to enter judgment in favor of
defendant and to close the file.


          IT IS SO ORDERED.


                        _____
                        VAUGHN R WALKER
                        United States District Chief Judge